UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Timothy Carrigan,

        Plaintiff,

        v.                                   Civil Action No. 2:10-cv-303

Michael J. Astrue,
Commissioner of Social Security,

        Defendant.

## <u>REPORT AND RECOMMENDATION</u>
(Docs. 4, 7)

Plaintiff Timothy Carrigan brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review and remand of the decision of the Commissioner

of Social Security ("Commissioner") denying his application for disability insurance

benefits.  Pending before the Court are Carrigan's motion to reverse the Commissioner's

decision (Doc. 4), and the Commissioner's motion to affirm the same (Doc. 7).  On

August 24, 2010, the Court heard oral argument on the motions.

For the reasons stated below, I recommend that the Court grant the

Commissioner's motion, and deny Carrigan's motion.

## <u>Background</u>

Carrigan was born on September 21, 1969, and thus was forty-six years old on the

alleged disability onset date of March 30, 2007.  (Administrative Record ("AR") 40, 134,

141, 161.)  He completed school through the twelfth grade, and worked as an artist's

agent for almost twenty years.  (AR 40-41, 64, 162, 166.)  In that job, he was responsible for handling the careers of models, photographers, hair stylists, and make-up artists, which involved managing their schedules, negotiating their rates, and promoting them to clients.  (AR 65, 162.)  Thereafter, he worked part-time as a housekeeper, and then as a recreation attendant at a condominium.  (AR 41, 64.)

The record reveals that Carrigan suffers from depression and anxiety (AR 43, 201, 360-63), secondary to migraine headaches (AR 320-22).  Additionally, he has had chronic problems with drug and alcohol abuse, with multiple attempts at detoxification. (AR 217-19, 234-40, 360-63.)  At the June 2010 administrative hearing, however, Carrigan reported that he had abstained from alcohol and drugs since December 2008. (AR 43.)

On February 3, 2009, Carrigan filed applications for supplemental security income ("SSI") and disability insurance benefits ("DIB"), which were denied initially and on reconsideration.  (AR 71-82.)  Pursuant to the DIB application, Carrigan alleges that, starting on March 30, 2007, he became unable to work as a result of depression and bi-polar disorder.  (AR 161.)  He claims that, due to these conditions, he is "unable to hold a job up to 8 to 11 months and . . . some jobs [he] can only do for a week."  (*Id.*)  On June 7, 2010, Administrative Law Judge ("ALJ") Dory Sutker conducted a hearing on Carrigan's DIB application.  (AR 34-70.)  Carrigan appeared and testified at the hearing, and was represented by counsel.  (*Id.*)  Additionally, vocational expert ("VE") Maurice Demers was present at the hearing.  (AR 59-69.)  On July 9, 2010, the ALJ issued a decision finding that Carrigan was not disabled under the Social Security Act from his

2

alleged onset date of March 30, 2007 through December 31, 2010, the date last insured. (AR 18-29.)  The Decision Review Board affirmed the ALJ's decision on October 13, 2010, making the decision final.  (AR 1-6.)  Having exhausted his administrative remedies, Carrigan filed the Complaint in this case on December 9, 2010.  (*See* Doc. 1.)

## ALJ Determination

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the fourth step requires the ALJ to consider whether the claimant's "residual functional capacity" ("RFC") precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The fifth and final step commands that the ALJ determine whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five,

3

there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's residual functional capacity").

Employing this sequential analysis, ALJ Sutker first determined that, although Carrigan had worked on a part-time basis at various jobs since the alleged disability onset date, these jobs "never reached a level indicative of substantial gainful activity." (AR 20.) At step two, the ALJ found that Carrigan had the medically determinable impairments of affective disorder (depression and anxiety), migraines, and "a history of drug and alcohol abuse, in remission." (AR 21.) At step three, the ALJ found that none of Carrigan's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 22-23.)

Next, the ALJ determined that Carrigan had the RFC to perform a full range of work at all exertional levels but with the following limitations:

> [Carrigan] is limited to performing routine and repetitive tasks with few, if any, work place changes. [Carrigan] cannot drive on the job and he cannot perform fast-paced jobs that require him to meet production quotas. He is able to do goal-oriented tasks. In addition, [Carrigan] must avoid work performed at unprotected heights. He cannot climb ropes, ladders or scaffolds and he must avoid exposure to dangerous moving machinery.

(AR 23.) At step four, the ALJ found that Carrigan could not perform his past relevant work as an artist's agent, housekeeper, or recreation attendant. (AR 27.) At step five, however, using the Medical-Vocational Rules as a framework, the

ALJ found that Carrigan was "not disabled."  (AR 27.)  The ALJ further

determined that, considering Carrigan's age, education, work experience, and

RFC, there are jobs existing in significant numbers in the national economy that he

could perform.  (AR 27-28.)  Specifically, relying on testimony from the VE, the

ALJ found that Carrigan could perform the jobs of escort, "order caller," and car

wash attendant.  (AR 28.)  Given these findings, the ALJ concluded that Carrigan

had not been under a disability from the alleged onset date of March 30, 2007

through the date of the decision.  (*Id.*)

### Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

423(d)(1)(A).  A person will be found disabled only if it is determined that his

"impairments are of such severity that he is not only unable to do his previous work[,] but

cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."  42 U.S.C. §

423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a

"review [of] the administrative record *de novo* to determine whether there is substantial

evidence supporting the . . . decision and whether the Commissioner applied the correct

legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v.*

*Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  A court's factual

review of the Commissioner's decision is limited to determining whether "substantial

evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v.

Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  "Substantial evidence" is more than a mere

scintilla; it means such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consol.

Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore*, 566 F.3d at 305.

      Although the reviewing court's role with respect to the Commissioner's disability

decision is "quite limited[,] and substantial deference is to be afforded the

Commissioner's decision," *Hernandez v. Barnhart*, No. 05 Civ. 9586, 2007 WL

2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (quotation marks and citation omitted), the

Social Security Act "must be construed liberally because it is a remedial statute that is

intended to include, rather than exclude, potential recipients of benefits," *Jones v. Apfel*,

66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999); *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d

Cir. 1981) ("In its deliberations the District Court should consider the fact that the Social

Security Act is a remedial statute to be broadly construed and liberally applied.").

<u>**Analysis**</u>

**I.**      **Carrigan's Mental Impairments**

      **A.**      **"Special Technique" (*Kohler*)**

      In addition to following the five-step analysis outlined above, the regulations

provide that, when evaluating the severity of a claimant's mental impairment(s), the ALJ

must apply a "special technique" to "rate the degree of functional limitation resulting

from the impairment(s)."  20 C.F.R. § 404.1520a(a), (b)(2).  The regulations set forth

"four broad functional areas" in which the ALJ must rate the degree of the claimant's

functional limitation.  20 C.F.R. § 404.1520a (c)(3).  Those areas are: "[a]ctivities of

daily living; social functioning; concentration, persistence, or pace; and episodes of

decompensation."  *Id.*  The regulations explicitly require the ALJ to "document"

application of this "special technique" in his or her decision.  20 C.F.R. § 404.1520a(e).

In *Kohler v. Astrue*, the Second Circuit explained:

> While the regulations no longer require the ALJ to complete [the standard
> Psychiatric Review Technique Form ("PRTF")], they do require the ALJ's
> written decision to reflect application of the technique, and explicitly
> provide that the decision "*must* include a specific finding as to the degree of
> limitation in each of the functional areas described in paragraph (c) of this
> section."

546 F.3d 260, 266 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1520a(e)(2)).

Carrigan argues that the ALJ did not properly follow this "special technique" in

evaluating his mental impairments.  Yet the ALJ explicitly stated at step three of her

decision that Carrigan had "mild restriction" in "activities of daily living"; "mild

difficulties" in "social functioning"; "moderate difficulties" with "concentration,

persistence[,] or pace"; and had experienced "no episodes of decompensation."[1]  (AR

22.)  The ALJ explained these findings at step three, correctly noting that, although

Carrigan "ha[d] difficulty maintaining attention for prolonged periods of time," he was

---

[1] Carrigan admits that the ALJ "did make a finding . . . regarding the four areas of functioning,"
but states that, because the ALJ did not complete a PRTF, her decision does not contain the "pertinent
findings and conclusions" required by the regulations, making it "impossible for th[e] court to know if
[her] findings . . . are supported by substantial evidence."  (Doc. 4 at 6.)  Carrigan clarifies the argument
in his reply, stating that "the ALJ's findings were not the result of the 'special technique,' at least, to the
extent that it complies with the factors found in the PRTF."  (Doc. 9 at 1.)

"able to care for his personal needs, prepare simple meals[,] and leave his home to attend multiple meetings and other appointments throughout the day"; and was "able to interact appropriately with others[2] and volunteer[]."  (*Id.*; *see* AR 176-77, 184-85, 255, 351.) Additionally, the ALJ accurately noted as part of her RFC assessment that Carrigan reported that he "was able to engage in a wide range of daily activities," enjoyed socializing with others over the phone, did his own laundry, and cleaned his house.  (AR 26; *see* AR 176-77, 184-85, 322, 351.)  The ALJ further noted, with proper citation to the record, that despite his depression, anxiety, and migraine headaches, Carrigan was able to shop, go to the gym, water ski, "go to the races," attend parties, and "work[] [at a] front desk."  (AR 25, 26 (citing AR 341-53).)  The ALJ also accurately stated that Carrigan's depression and anxiety had been present throughout his lifetime but "ha[d] not interfered with his ability to engage in work activities."  (AR 25.)  Finally, the ALJ correctly noted that, after Carrigan had experienced anxiety at work in March 2010, "[h]is medication dosage was adjusted . . . and improvement was noted."  (AR 25 (citing AR 345-46).)

*Kohler* is distinguishable from this case, as there, the ALJ's written decision "lack[ed] specific findings with respect to each of the four functional areas described in § 404.1520a(c)."[3]  *Kohler v. Astrue*, 546 F.3d at 266.  The court explained:

> In this case, the ALJ does not appear to have evaluated each of the four functional areas, and *did not record specific findings as to Kohler's degree of limitation in any of the areas*.  Nor did he conduct a distinct analysis that would permit adequate review on appeal even without the requisite

---

[2] At the Administrative Hearing, Carrigan testified that he had no difficulty dealing with supervisors or taking criticism.  (AR 57.)

[3] The court in *Kohler* described the relevant portion of the ALJ's decision as follows: "The ALJ provided little analysis for [his step three] conclusion."  *Kohler v. Astrue*, 546 F.3d at 264.

findings. . . .

    . . . .

Effective review by this Court is frustrated by the [ALJ] decision's failure to adhere to the regulations.  First, because *the decision contains no specific findings regarding Kohler's degree of limitation in the four functional areas by which disabling conditions are rated*, the Court cannot determine whether there is substantial evidence for the ALJ's conclusion that Kohler's impairment, while severe, was not as severe as any listed disabling condition. . . .

These deficiencies are compounded by the ALJ's tendency to overlook or mischaracterize relevant evidence, often to Kohler's disadvantage.

*Id.* at 267-68 (emphasis added).  Here, the ALJ did not overlook or mischaracterize relevant evidence, and, as noted above, applied the special technique to record specific findings regarding Carrigan's degree of limitation in each of the four functional areas.

## B.    Episodes of Decompensation/GAF Scores

Carrigan contends that the ALJ's application of the "special technique" is particularly deficient with respect to the finding that Carrigan "experienced no episodes of decompensation."  (AR 22.)  Specifically, Carrigan argues that the opinion of treating nurse Nancy Driscoll constitutes evidence that Carrigan had experienced three episodes of decompensation, and that Nurse Driscoll's Global Assessment of Functioning ("GAF") scores, particularly the scores of 50 and below, "are indicative of decompensation."  (Doc. 4 at 7.)

An "episode of decompensation" is defined in the applicable regulation as an "exacerbation[ ] or temporary increase[ ] in symptoms or signs accompanied by a *loss of adaptive functioning*, as manifested by difficulties in performing activities of daily living,

maintaining social relationships, or maintaining concentration, persistence, or pace."  20

C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4) (emphasis added).  The regulation further

states that "[t]he term repeated episodes of decompensation, each of extended duration . .

. means three episodes within 1 year, or an average of once every 4 months, *each lasting*

*for at least 2 weeks*." *Id.* (emphasis added).  In her Treating Source Statement, Nurse

Driscoll wrote underneath a section inquiring about "[e]pisodes of decompensation," that

Carrigan (1) had to quit his housekeeping job in September "[secondary] to

decompensation"; (2) felt suicidal in October and called the head of Alcoholics

Anonymous; and (3) was being "push[ed]" to work in February and March of 2009 but

was "unable."  (AR 356.)  Even assuming these instances occurred, they do not

necessarily demonstrate a "loss of adaptive functioning,"[4] and there is no indication that

each instance lasted for "at least 2 weeks," as required by the applicable regulation.[5]  20

C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4).  Moreover, in contrast to Nurse Driscoll's

opinion, at least two consulting agency physicians specifically opined that Carrigan had

experienced no episodes of decompensation of extended duration.  (AR 290, 296.)

---

[4] Listing 12.00(C)(1) defines "adaptive activities" to include activities such as "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(1).

[5] In his reply, Carrigan points out that 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4) allows for an exception to the requirement that an episode of decompensation last at least two weeks.  (*See* Doc. 9 at 5-6.)  In relevant part, the regulation provides: "If you have experienced *more frequent episodes of shorter duration or less frequent episodes of longer duration*, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence."  (Emphasis added.)  It is unclear whether Carrigan asserts that he experienced "more frequent episodes of shorter duration" or "less frequent episodes of longer duration."  It is not enough to merely allege that the ALJ erred in failing to consider the *possibility* that one or the other types of episodes of decompensation existed.  Moreover, the record – as discussed herein and in the ALJ's decision – does not support either possibility, and thus the argument fails.

10

Further, the ALJ accurately noted that, although Carrigan had been hospitalized for alcohol withdrawal, he had never been hospitalized "to treat an acute exacerbation of depression." (AR 25; *see* AR 217-18, 220-24, 234-37.) The ALJ also correctly noted that Carrigan had not participated in an intensive outpatient program for his depression, and that improvement for Carrigan's mental impairments had been shown through counseling and medication management. (AR 25.) In fact, a treatment note from Dr. Linda Diaz, whom Carrigan saw in June 2009 for "visual loss," concluded by stating that, aside from the visual issues, "the only other medical problems that [Carrigan] has are his substance abuse, which is now in remission secondary to his excellent efforts, and his bipolar disorder which is apparently *adequately treated with the medications* he is on at the moment." (AR 315 (emphasis added).) Similarly, treatment notes from Dr. Evelyn Gerretson, with whom Carrigan consulted in December 2008 to assess whether Carrigan had psychiatric issues that should be treated in a psychiatric unit, included the following two relevant statements: (1) "He states in the past his depression has *resolved by sobriety*"; and (2) "[Carrigan] is . . . depressed which *appears to be in the context of his alcoholism*." (AR 235, 236 (emphases added).)

Carrigan's argument regarding the GAF[6] scores assigned by Nurse Driscoll is similarly unpersuasive. In his motion, Carrigan lists the GAF scores assigned by Nurse Discoll during the years 2009 and 2010. (*See* Doc. 4 at 8.) Most of those scores range from 50 to 55, which generally accords with the ALJ's statement that "Ms. Driscoll

---

[6] "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d at 262 n.1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), at 32 (4th ed. 2000)).

generally assigned GAF[]s in the mid-50's." (AR 26.) The ALJ also accurately noted that a score in this range (the mid-50s) "is indicative of only moderate difficulty in social or occupational functioning." (*Id.*) Specifically, a score of "51-60" indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers)." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), at 32 (4th ed. 2000). A score of "41-50," on the other hand, indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

Nurse Driscoll apparently assigned to Carrigan GAF scores of 50 or below, i.e., scores indicating "serious" symptoms, on ten occasions. (*See* Doc. 4 at 8 (citing AR 249, 256, 274-75, 278, 344-46, 351, 354).) More notably, however, Nurse Driscoll assigned GAF scores of below 50 to Carrigan on only four occasions, each of those occasions occurring on particular days during the month of March 2010. (*See* Doc. 4 at 8 (citing AR 344-46, 354).) Carrigan claims that the ALJ's failure to discuss the GAF scores of 50 or below was error, but, as this Court has stated before, GAF scores – in and of themselves – do not demonstrate that an impairment significantly interferes with a claimant's ability to work. *Parker v. Astrue*, No. 2:10-cv-195, 2011 WL 1838981, at *6 (D. Vt. May 13, 2011) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) ("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score.")). Rather, a low GAF score is only "one

12

factor" to consider in determining an individual's ability to perform substantial gainful activity. *Parker v. Astrue*, 2011 WL 1838981, at *6 (citation omitted). Furthermore, the fact that one provider (Nurse Driscoll) assigned ten GAF scores indicating the existence of "serious" symptoms during a fifteen-month period is not particularly remarkable, considering that (a) six of those ten scores were 50, very close to a "moderate" rating; (b) the remaining four "serious" scores were assigned during the same month; and (c) the same provider assigned thirteen other GAF scores indicating the existence of only "moderate" symptoms during the same fifteen-month period.

### C.      Function-by-Function Analysis (SSR 96-8p, *Lechner*, and *Pabon*)

More generally, Carrigan argues that the ALJ's mental RFC assessment does not contain the detailed analysis required by Social Security Ruling ("SSR") 96-8p, which states: "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities *on a function-by-function basis*." 1996 WL 374184, at *1 (1996) (emphasis added). Notably, however, Carrigan fails to specify (a) what particular functional limitations he allegedly possessed during the disability period which the ALJ erroneously neglected to discuss, and (b) what evidence the ALJ improperly failed to evaluate in assessing Carrigan's mental RFC. Instead, Carrigan relies on two cases to support his claim, one from the Eastern District of Wisconsin and the other from the Southern District of New York. (*See* Doc. 4 at 9-10 (citing *Lechner v. Barnhart*, 321 F. Supp. 2d 1015 (E.D. Wis. 2004) and *Pabon v. Barnhart*, 273 F. Supp. 2d 506 (S.D.N.Y. 2003)).) Even if the holdings of these cases were binding on this court (which they are not), neither case demonstrates ALJ error here.

13

In *Lechner*, 321 F. Supp. 2d at 1036, the Eastern District of Wisconsin remanded because the ALJ failed to assess the claimant's mental abilities on a function-by-function basis, and failed to offer an explanation for or cite to medical evidence supporting her RFC assessment. The court summarized its ruling by simply stating: "The ALJ's decision is being reversed primarily because she failed to properly evaluate the evidence." *Id.* at 1037. Here, on the other hand, as discussed above, the ALJ sufficiently addressed Carrigan's functional limitations in determining his mental RFC, and the ALJ's discussion of the relevant evidence is accurately supported by the record. (*See* AR 22-23, 25-26 (citing AR 176-77, 197-211, 212-46, 254-55, 257, 269, 273, 275-76, 305, 320-22, 331, 336, 345-47, 349-51).) Specifically, as part of her RFC assessment, the ALJ determined that Carrigan could perform only "routine and repetitive tasks with few, if any, work place changes"; could not drive on the job; and could not "perform fast-paced jobs requiring him to meet production quotas." (AR 23.) These limitations correspond with the ALJ's assessment that Carrigan had "moderate" difficulties in concentration, persistence, or pace. (AR 22.) Consistent with her determination that Carrigan had only "mild" restriction in activities of daily living and social functioning and "no" episodes of decompensation (*id.*), the ALJ did not include additional limitations in Carrigan's mental RFC. In citing *Lechner*, Carrigan seems to argue that the ALJ's failure to explicitly use a "special form" known as the Mental Residual Functioning Capacity Assessment form to analyze Carrigan's mental impairments, and her failure to explicitly consider the thirteen functional limitations listed in *Lechner* and cited in a Social Security Program Operations Manual System opinion, constitutes legal error and requires remand. (*See* Doc. 4 at 8-9.)

14

There is no support for this argument.

In *Pabon*, 273 F. Supp. 2d at 516, also cited by Carrigan in support of his mental RFC argument, the Southern District of New York remanded because the ALJ failed to "address[ ] the specific mental demands of unskilled work" in assessing the claimant's RFC.  Quoting SSR 96-8p, the court explained that, "[d]etermining mental RFC 'requires a more detailed assessment by itemizing various functions contained in the broad categories.'"  *Id.*  As with *Lechner*, Carrigan's reliance on *Pabon* is unpersuasive. Neither case stands for the proposition that an ALJ's failure to express a claimant's mental RFC in terms of work-related functions is a *per se* basis for remand.

In fact, although the Second Circuit has not decided whether non-compliance with SSR 96-8p's "function-by-function" analysis requirement is *per se* grounds for remand, *Kelly v. Astrue*, No. 09-CV-1359 (GLS/VEB), 2011 WL 817507, at *8 (N.D.N.Y. Jan. 18, 2011), at least five circuit courts of appeal have held otherwise, concluding that, although a function-by-function analysis is desirable, the ALJ need not discuss each factor in his or her written opinion.  *See Zatz v. Astrue*, 346 F. App'x 107, 111 (7th Cir. 2009) ("[A]n ALJ need not provide superfluous analysis of irrelevant limitations or relevant limitations about which there is no conflicting medical evidence."); *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) ("Preparing a function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary."); *Depover v. Barnhart*, 349 F.3d 563, 567 (8th Cir. 2003) (an ALJ does not fail in his or her duty to assess a claimant's RFC on a function-by-function basis merely because the ALJ does not address all areas regardless

15

of whether a limitation is found); *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547

(6th Cir. 2002) (citing *Bencivengo v. Comm'r of Soc. Sec.*, 251 F.3d 153 (3d Cir. 2000))

("Although SSR 96-8p requires a 'function-by-function evaluation' to determine a

claimant's RFC, case law does not require the ALJ to discuss those capacities for which

no limitation is alleged.").[7]   The more important issues are (a) whether the ALJ discussed

the claimant's work-related functions and limitations in his or her RFC analysis, and (b)

---

[7] With respect to courts in the Second Circuit, the Northern District of New York provided the following useful discussion and collection of relevant cases:

District courts in the Second Circuit have reached different conclusions [regarding whether the ALJ must engage in a function-by-function analysis], with courts in the Northern and Western Districts of New York generally concluding that a remand is required when the ALJ fails to provide a function-by-function analysis. *See, e.g., Wood v. Comm'r of Soc. Sec.*, No. 06-CV-157, 2009 WL 1362971, at *6 (N.D.N.Y. May 14, 2009) (collecting cases); *McMullen v. Astrue*, No. 05-CV-1484, 2008 WL 3884359, at *6 (N.D.N.Y. Aug.18, 2008); *Brown v. Barnhart*, No. 01-CV-2962, 2002 WL 603044, at *5-7 (E.D.N.Y. Apr.15, 2002) ("In sum, because the ALJ did not properly apply the legal standard in Social Security Ruling 96-8p for assessing residual functional capacity, I cannot properly conclude that his finding that the claimant retained the residual functional capacity to do her past work was supported by substantial evidence."); *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 208 (W.D.N.Y. 2005) ("The ALJ's decision did not address the plaintiff's ability to sit, stand, or walk ... Since the ALJ failed to make a function-by-function analysis of plaintiff's RFC, his determination that she had the RFC for sedentary work is not supported by substantial evidence."); *but see Casino-Ortiz v. Astrue*, No. 06 Civ. 0155(DAB)(JCF), 2007 WL 2745704, at *13 (S.D.N.Y. Sept. 21, 2007) (sustaining ALJ's decision, notwithstanding failure to provide function-by-function analysis); *Novak v. Astrue*, No. 07 Civ. 8435, 2008 WL 2882638, at *3 & n.47 (S.D.N.Y. July 25, 2008) ("The ALJ must avoid perfunctory determinations by considering all of the claimant's functional limitations, describing how the evidence supports her conclusions, and discussing the claimant's ability to maintain sustained work activity, but she need not provide a narrative discussion for each function."); *but see Martin v. Astrue*, No. 05-CV-72, 2008 WL 4186339, at *16 (N.D.N.Y. Sept. 9, 2008) (declining to remand, despite finding that the ALJ grouped the functions in his function-by-function analysis because "treating the activities separately would not have changed the result of the RFC determination").

This Court is inclined toward the view that, in limited circumstances, the ALJ's failure to provide a function-by-function analysis might constitute harmless error, provided that the absence of the analysis did not frustrate meaningful review of the ALJ's overall RFC assessment.

*Kelly v. Astrue*, 2011 WL 817507, at *8-9.

whether, regardless of how the ALJ's RFC assessment was expressed, it was supported by substantial evidence.  *See Sanderson v. Astrue*, No. 08–CV–1177 (GTS/VEB), 2011 WL 1113856, at \*5 (N.D.N.Y. Jan. 19, 2011) ("This Court is inclined towards the view that failure to express the mental RFC in terms of work-related functions is not a *per se* basis for remand where, as here, the ALJ discussed the work-related functions in his analysis.").  In this case, the ALJ discussed Carrigan's work-related functions and limitations in her analysis, and her RFC assessment is supported by substantial evidence which is accurately cited and described in her decision, as discussed above.

## II.      Opinion of Nurse Driscoll

Carrigan contends that the ALJ erred in discounting Nurse Driscoll's opinions.  As a nurse and not a licensed physician or psychologist, Driscoll is not an "acceptable medical source," and thus the treating physician rule does not apply to her opinions.  20 C.F.R. § 416.913(a).  SSR 06-03p provides guidance regarding how ALJs should handle opinions from sources other than "acceptable medical sources," including nurses:

> In addition to evidence from "acceptable medical sources," we may use evidence from "other sources" . . . to show the severity of the individual's impairment(s) and how it affects the individual's ability to function.  These sources include, but are not limited to . . . nurse practitioners . . . .
> . . . .
>
> . . . Opinions from these [other] sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.
> . . . .
>
> Although the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other

17

sources." These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not "acceptable medical sources" . . . . These factors include:

• How long the source has known and how frequently the source has seen the individual;

• How consistent the opinion is with other evidence;

• The degree to which the source presents relevant evidence to support an opinion;

• How well the source explains the opinion;

• Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

• Any other factors that tend to support or refute the opinion.

SSR 06-03p, 2006 WL 2329939, at *2-4 (Aug. 9, 2006). Thus, while an ALJ is free to conclude that the opinion of an "other source" is not entitled to any weight, or is entitled to only minimal weight, the ALJ must explain that decision. *See Marziliano v. Sullivan*, 771 F. Supp. 69, 75 (S.D.N.Y. 1991) (holding that opinion of "other source" is entitled to "some consideration").

The ALJ in this case properly handled Nurse Driscoll's opinion, in compliance with SSR 06-03p and the applicable regulations. The ALJ stated in her decision that she considered Nurse Driscoll's opinion, which "indicated that [Carrigan] ha[d] numerous and severe mental signs, symptoms[,] and limitations," but found that the opinion "warrant[ed] less weight than that of a treating physician." (AR 26.) The ALJ then listed the reasons justifying her decision not to afford significant weight to the opinion: (1) "a nurse practitioner is not an 'acceptable medical source' under the regulations"; (2) Nurse

Driscoll's assessed limitations, including the GAF scores she assigned to Carrigan, "are

wholly unsupported in the record, including her own treatment notes"; and (3) Nurse

Driscoll's opinion "is not consistent with [Carrigan's] description of his activities of daily

living, which indicate that he goes out to shop, water ski, volunteer[,] and to party."  (*Id.*)

As discussed in detail above, substantial evidence supports the ALJ's reasons for

declining to assign significant weight to Nurse Driscoll's opinion.

## III.   Vocational Expert Opinion

Next, Carrigan argues that the ALJ erred in relying on the VE's testimony, where

that testimony conflicted with the Dictionary of Occupational Titles ("DOT").  More

specifically, Carrigan claims that the ALJ's assessment that Carrigan was limited to

performing "routine and repetitive tasks with few, if any, work place changes" (AR 23),

precluded performance of the jobs identified by the VE, all of which are rated at General

Educational Developmental Reasoning Levels of "2," which requires "apply[ing]

commonsense understanding to carry out detailed but uninvolved written or oral

instructions [and] [d]eal[ing] with problems involving a few concrete variables in or from

standardized situations."  U.S. Dep't of Labor, *Dictionary of Occupational Titles*, DICOT

353.667-010, 1991 WL 672929 (4th ed. 1991).[8]

As the Commissioner points out, the relevant law does not support Carrigan's

claim.  In *Edwards v. Astrue*, No. 5:07-CV-898 (NAM/DEP), 2010 WL 3701776, at *15

(N.D.N.Y. Sept. 16, 2010), the Northern District of New York held as follows: "Working

---

[8] In his motion, Carrigan states as follows: "Here, . . . the ALJ found that Mr. Carrigan was limited to 'few, if any, workplace changes.'  That is more similar to a Reasoning Level 1 . . . .  Therefore, the VE's opinion that Mr. Carrigan can do Reasoning Level 2 jobs is not consistent with the DOT." (Doc. 4 at 15.)

at reasoning level 2 does not contradict a mandate that work be simple, routine and repetitive."  In support of this proposition, the court cited two appellate court decisions from the Third and Tenth Circuits, respectively.  *Id.* (citing *Hackett v. Barnhart*, 395 F.3d 1168, 1175 (10th Cir. 2005); *Money v. Barnhart*, 91 F. App'x 210, 215 (3rd Cir. 2004)).  The Seventh and Ninth Circuits have similarly held.  *See Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009); *Lara v. Astrue*, 305 F. App'x 324, 326 (9th Cir. 2008).  Although some courts have taken the opposite position, finding that a limitation to simple instructions or tasks conflicts with an indication in the DOT that a job has a GED reasoning level of 2, these cases "are increasingly in the minority."  *Pepin v. Astrue*, No. 09-464-P-S, 2010 WL 3361841, at *2 (D. Me. Aug. 24, 2010).  The District of Maine recently addressed this issue in detail, explaining as follows:

> Within the last year, this court has recognized that DOT definitions, created by the Department of Labor, are not necessarily totally compatible with regulations created by the Social Security Administration.  *Prescott v. Astrue*, No. 09-23-B-W, 2009 WL 3148731, at *3 (D. Me. Sept. 30, 2009) (citing *Meissl v. Barnhart*, 403 F. Supp. 2d 981, 984 (C.D. Cal. 2005)).
>
> In *Meissl*, . . ., the United States District Court for the Central District of California offered a well-reasoned and compelling rationale for rejecting the notion that there is any seeming conflict between a limitation to "simple tasks performed at a routine pace," 403 F. Supp. 2d at 82, and an indication in the DOT that the jobs concerning which a vocational expert had testified had a GED reasoning level of 2.
>
> . . . .
>
> The clear majority of the courts that have addressed this issue since 2005, including three circuit courts of appeal, agree with the *Meissl* court.  *See Lara v. Astrue*, 305 F. App'x 324, 326, 2008 WL 4927346, at *1 (9th Cir. Nov. 19, 2008) ("[S]omeone able to perform simple, repetitive tasks is capable of doing work requiring more rigor and sophistication-in other words, Reasoning Level 2 jobs."); *Stokes v. Astrue*, 274 F. App'x 675, 684,

2008 WL 1766788, at *8 (10th Cir. Apr. 18, 2008) ("In *Hackett v. Barnhart*, we held that a limitation 'for simple and routine work tasks' was inconsistent with the demands of level-three reasoning but consistent with the demands of level-two reasoning, 395 F.3d 1168, 1176 (10th Cir. 2005)[.]"); *Money v. Barnhart*, 91 F. App'x 210, 215, 2004 WL 362291, at *3 (3d Cir. Feb. 25, 2004) ("Working at reasoning level 2 would not contradict the mandate that [the claimant's] work be simple, routine and repetitive."). One circuit court has gone even further. *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (RFC for simple work not inconsistent with jobs listed in DOT at reasoning level 3).

*Id.* at *3-4. The District of Maine then proceeded to present a "partial list of federal district court opinions adopting the same position with respect to reasoning level 2 jobs." *Id.* at *5.

The weight of the authority compels a conclusion that, generally, someone like Carrigan, who is able to perform simple, repetitive tasks, is capable of performing Reasoning Level 2 jobs. Moreover, substantial evidence supports the ALJ's RFC analysis and ultimate determination that Carrigan was able to perform jobs involving "routine and repetitive tasks with few, if any, work place changes" (AR 23), which jobs may require a Reasoning Level of 2. Carrigan has not specified why he was unable to perform the jobs listed by the VE and adopted by the ALJ, including an escort, an "order caller," and a car wash attendant (AR 28), and I find that the ALJ was entitled to rely on the VE's testimony regarding Carrigan's ability to perform these jobs.

## IV.   Carrigan's Age/Application of "The Grids"

Finally, Carrigan asserts that the ALJ erred by failing to consider that, at the time of the administrative hearing, he was within a few months of an older category, "closely

21

approaching advanced age" (age 50-54).[9]  20 C.F.R. § 404.1563(d).  The argument easily

fails.  The applicable regulation, 20 C.F.R. § 404.1563(b), provides as follows:

> If you are within a few days to a few months of reaching an older age
> category, *and using the older age category would result in a determination
> or decision that you are disabled*, we will consider whether to use the older
> age category after evaluating the overall impact of all the factors of your
> case.

(Emphasis added.)  Here, the ALJ found that Carrigan had no exertional limitations, and

thus used Medical-Vocational Rule 204.00 as a framework for making a finding of "not

disabled."  (AR 27-28.)  Rule 204.00 states as follows, in relevant part: "[A]n impairment

which does not preclude heavy work . . . would not ordinarily be the primary reason for

unemployment, and generally is sufficient for a finding of not disabled, *even though age .*

*. . may be considered adverse*."  20 C.F.R. pt. 404, subpt. P, app. 2 at § 204.00 (emphasis

added).  Therefore, using the older age category in this case would not have resulted in a

determination that Carrigan was disabled, and the ALJ did not err by failing to consider

that Carrigan was within a few months of an older category at the time of the

administrative hearing.

   *Jerome v. Astrue*, No. 2:08-CV-98, 2009 WL 3757012 (D. Vt. Nov. 6, 2009), cited

in Carrigan's moving brief, is distinguishable for two principal reasons.  First, in that

case, the ALJ "mechanically applied the 'younger person' age category" to the claimant,

and stated in his decision that the claimant's "additional nonexertional limitations *have*

*little or no effect* on the occupational base of unskilled light work."  *Id.* at *3 (emphasis

---

[9] Carrigan failed to address this issue in his Reply (*see* Doc. 9), but reasserted it at the August 24,
2011 oral argument.

added).  Here, on the other hand, the ALJ stated that "[Carrigan's] ability to perform work at all exertional levels *has been compromised* by nonexertional limitations," and thus, the ALJ used the Grids only as a framework for determining whether Carrigan was disabled.  (AR 28 (emphasis added).)  Second, in *Jerome*, the ALJ applied Medical-Vocational Rules 202.20-202.22 to determine that the claimant was not disabled, *see Jerome*, 2009 WL 3757012,  at *3; whereas here, as discussed above, the ALJ used Medical-Vocational Rule 204.00, which explicitly provides that the claimant's age has no impact on the disability determination.

## Conclusion

For these reasons, I recommend that the Commissioner's motion (Doc. 7) be GRANTED, and Carrigan's motion (Doc. 4) be DENIED.

Dated at Burlington, in the District of Vermont, this 26th day of August, 2011.

*/s/John M. Conroy*
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c).  Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation.  *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).